1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )   Docket No. 19 CR 00226-3
                                     )
4                   Plaintiff,       )   Chicago, Illinois
                                     )   May 23, 2022
5            v.                      )   9:44 a.m.
                                     )
6   ROSALLIE C. CORVITE,             )
                                     )
7                   Defendant.       )

8
            TRANSCRIPT OF PROCEEDINGS - Change of Plea
9           BEFORE THE HONORABLE VIRGINIA M. KENDALL

10
    APPEARANCES:    (Via WebEx Videoconference)
11

12  For the Government:      UNITED STATES ATTORNEY'S OFFICE by
                             MR. BRIAN P. NETOLS
13                           Assistant United States Attorney
                             219 South Dearborn Street, 5th Floor
14                           Chicago, Illinois  60604

15  For the Defendant:       DOUGLAS WHITNEY LAW OFFICES by
                             MR. DOUGLAS E. WHITNEY
16                           120 North LaSalle Street, Suite 2000
                             Chicago, IL  60601

17

18

19

20

21
    Court Reporter:          GAYLE A. McGUIGAN, CSR, RMR, CRR
22                           Official Court Reporter
                             219 S. Dearborn Street, Room 2504
23                           Chicago, IL 60604
                             312.435.6047
24                           gayle_mcguigan@ilnd.uscourts.gov

25

1       (Proceedings had via videoconference.)

2               THE CLERK:  Good morning.  Court resumes session.

3               Case number 19 CR 226, Defendant 3, U.S. versus

4       Rosallie Corvite.

5               Please introduce yourself, starting with the

6       United States.

7               MR. NETOLS:  Good morning.  Brian Netols on behalf of

8       the United States.

9               THE COURT:  Good morning.

10              MR. WHITNEY:  Good morning, your Honor.  Doug Whitney

11      for Ms. Corvite, who is present on the WebEx.

12              THE COURT:  Good morning, Ms. Corvite.

13              Can you turn on your video?

14              THE DEFENDANT:  Good morning, your Honor.

15              THE COURT:  Good morning.

16              Okay.  It's my understanding, Ms. Corvite, that you

17      intend to plead guilty today.  And I have a plea agreement in

18      front of me that has been signed, I believe, by you and your

19      attorney.

20              In order for me to accept a plea of guilty, I need to

21      ask you some questions about your health, your well-being, and

22      your education so that I can determine if you are competent to

23      enter the plea.  So I'm going to place you under oath, so

24      please raise your right hand.

25              Do you swear that the answers to my questions will be

the truth, the whole truth, and nothing but the truth, so help
you God?

      THE DEFENDANT:  Yes, your Honor.

    (Defendant sworn.)

      THE COURT:  Okay.  Ms. Corvite, how old are you?

      THE DEFENDANT:  Forty-six.

      THE COURT:  What's your highest level of education?

      THE DEFENDANT:  Bachelor's degree in (indecipherable).

      THE COURT:  In what?

      THE DEFENDANT:  Bachelor's degree in accounting.

      THE COURT:  Oh, in accounting.  Okay.  All right.

      Have you ever suffered from any serious medical
conditions?

      THE DEFENDANT:  No, your Honor.

      THE COURT:  Do you take any medicines on a regular
basis?

      THE DEFENDANT:  No, your Honor.

      THE COURT:  Have you ever suffered from a mental
health condition?

      THE DEFENDANT:  No, your Honor.

      THE COURT:  Have you ever taken medication for mental
health?

      THE DEFENDANT:  No, your Honor.

      THE COURT:  Okay.  Have you had any alcohol in the
last 24 hours?

1          THE DEFENDANT:  No, your Honor.

2          THE COURT:  Have you had any drugs in the last 24

3    hours?

4          THE DEFENDANT:  No, your Honor.

5          THE COURT:  Okay.  Ms. Corvite, I have in front of me

6    a 23-page document.  And it's entitled "Plea Agreement" in

7    United States versus America -- excuse me, United States of

8    America versus Ms. Corvite.

9          Have you reviewed this document with your attorney?

10          THE DEFENDANT:  Yes, your Honor.

11          THE COURT:  When you were reviewing it with him, did

12    you ask him questions about it?

13          THE DEFENDANT:  Yes, your Honor.

14          THE COURT:  And when you were talking with him, did he

15    explain things to you such as the difference between the

16    sentencing guidelines versus the maximum penalties under the

17    law?

18          THE DEFENDANT:  Yes, your Honor.

19          THE COURT:  Okay.  And he answered those questions

20    when you had them, right?

21          THE DEFENDANT:  Yes, your Honor.

22          THE COURT:  Okay.  Do you think you had enough time to

23    review this document?

24          THE DEFENDANT:  If I had enough time?

25          THE COURT:  Yes, did you have enough time?

1          THE DEFENDANT:  Yes.  Yes, your Honor.

2          THE COURT:  Do you want any more time to review it?

3          THE DEFENDANT:  No, your Honor.

4          THE COURT:  Okay.  Are you satisfied with

5    Mr. Whitney's representation?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  Okay.  Mr. Whitney, any reason to question

8    her competence, sir?

9          MR. WHITNEY:  No, Judge.

10          THE COURT:  Okay.  Any reason, Mr. Netols?

11          MR. NETOLS:  No, your Honor.  I've had the opportunity

12    to speak with Ms. Corvite extensively on a number of occasions.

13    I have no reason to believe she's not competent.

14          THE COURT:  Okay.  All right.  I'm going to accept

15    your plea of guilt -- I'm sorry.  Why did I even say that?  I'm

16    going to find that you are competent to enter into this plea

17    agreement -- must be a Monday morning, right -- I'm going to

18    find you are competent to enter into this plea.

19          And now let's return to the document.

20          So you've been charged in the fourth superseding

21    indictment in this case, in Counts 1 and 2, with conspiracy to

22    commit offenses against the United States.

23          And you've also been charged with making false entries

24    in the books of a financial institution.  That's Counts 5 and

25    6.

1    And this plea agreement has you pleading guilty to

2    Count 1.  That is one of those conspiracy charges.

3         Do you understand that?

4         THE DEFENDANT:  Yes, your Honor.

5         THE COURT:  Okay.  Now, that conspiracy charge has a

6    maximum penalty of five years in prison.

7         It carries a maximum fine under the law of $250,000 or

8    twice the gross gain or the gross loss, whichever one is

9    greater.

10        And also a term of supervised release of not more than

11   three years.

12        There's also restitution that is ordered by the Court.

13        And a $100 special assessment.

14        Now, under the law, that's the highest penalty that

15   you can receive by pleading guilty today.

16        Do you understand that?

17        THE DEFENDANT:  Yes, your Honor.

18        THE COURT:  Okay.  But, here, we also do something --

19   we make a calculation under what we call the sentencing

20   guidelines.  Those are not mandatory, but they must be taken

21   into account prior to sentencing you.

22        So the way the sentencing hearing will work is that we

23   will calculate a sentencing guideline calculation.  That will

24   give me an advisory range of a sentence for your conduct.  And

25   then I'll turn to the 3553 factors under the statute.  And

those factors will include the seriousness of the offense; the
need to promote respect for the rule of law; the need to avoid
sentencing disparities that are unwarranted; the need to take
into account your history and characteristics about you that
would include any criminal history and whether you might commit
a crime again; also your health, well-being, and other concerns
individually about you.  And then I fashion a sentence that
takes into account all of those factors, and I impose a
sentence at that point.

Is that your understanding as to how the sentencing
hearing will work?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Okay.  So let's take a look at those
sentencing guideline calculations.

The parties used the 2021 manual, which is the most
recent manual.  And the base offense level pursuant to the
theft guideline and the conspiracy guideline is a base offense
level of 7.

And then it is increased 24 levels because the loss
amount is between 65 million and $150 million.

It's increased another two levels because ten or more
victims were involved.

And another two levels because the offense involved
sophisticated means, and you engaged in conduct involving
sophisticated means.

1           It's then increased another four levels because it

2    jeopardized the safety and the soundness of a financial

3    institution.

4           Another two levels because you abused a position of

5    trust with Washington Federal.

6           Now, you would receive three levels off for pleading

7    guilty and doing so in a timely fashion.

8           And that means that, when you total all of that up,

9    you get a total offense level of 38.

10          Now, you have no criminal history, so you have a

11    criminal history category of I.

12          And the advisory guideline range is 235 to 293 months

13    in prison, plus that supervised release, any fine and

14    restitution that I might impose, and that $100 special

15    assessment.

16          Now, the statutory maximum, however, is what you are

17    going to plead to, which is the maximum for a conspiracy.  So

18    even though the advisory guideline range has you up at 235

19    months to 293 months in prison, you're pleading only to one

20    count of a conspiracy, which is capped under the law at 60

21    months.

22          Is that your understanding?

23          THE DEFENDANT:  Yes, your Honor.

24          THE COURT:  Okay.  Now, these guidelines are only

25    advisory in nature.  And so what will happen is that there will

1    be a probation officer who will draft a report.  Your attorney

2    and the government attorney can challenge those.  What you need

3    to understand is that this is a preliminary calculation.

4           Is that your understanding?

5           THE DEFENDANT:  Yes, your Honor.

6           THE COURT:  Okay.  But by pleading guilty to the one

7    count, which is capped at five years, that's the maximum

8    penalty that you could receive.

9           Is that your understanding?

10          THE DEFENDANT:  Yes, your Honor.

11          THE COURT:  Okay.  Now, you're also agreeing to fully

12   and truthfully cooperate in any manner in which you're called

13   on to testify for the Northern District of Illinois U.S.

14   Attorney's Office.  So it requires that you provide complete

15   and truthful information to any investigation -- criminal,

16   civil, or administrative proceeding -- and it also requires

17   that you postpone your sentencing until all of the other

18   defendants in this case are sentenced.

19          Do you understand that?

20          THE DEFENDANT:  Yes, your Honor.

21          THE COURT:  Okay.  Now, at the time of sentencing, the

22   government intends to make known to me the extent of your

23   cooperation.  And if they believe that you have continued to

24   provide full and truthful cooperation, then they're going to

25   move the Court to depart downward and impose a sentence below

1    the applicable guideline sentence in an amount to be determined

2    at the time of sentencing.  Mr. Whitney can recommend any

3    sentence he thinks is appropriate, but the decision to depart

4    from the guidelines rests solely with me.

5            Do you understand that?

6            THE DEFENDANT:  Yes, your Honor.

7            THE COURT:  So if the government doesn't move the

8    Court for this cooperation departure under the guideline 5K1.1,

9    then both parties will be free to recommend any sentence.  And

10   I will sentence you under those factors that I mentioned a

11   little while ago under 3553 as well as the sentencing

12   guidelines without any downward departure.  But that does not

13   allow you to withdraw your guilty plea.

14           Do you understand that?

15           THE DEFENDANT:  Yes, your Honor.

16           THE COURT:  Okay.  So I'm not a party to this

17   agreement.  This is between you and the government.

18           Do you understand that?

19           THE DEFENDANT:  Yes.  Yes, your Honor.

20           THE COURT:  Okay.  Now, regarding restitution, you are

21   going to be obligated to pay restitution.  That amount will be

22   determined by me at the time of sentencing, and it will be a

23   part of the judgment and conviction order.  It will be together

24   jointly held with your co-defendants in this case.

25           Is that your understanding?

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  Now, your attorney is going to reserve the

3     right to argue that restitution should be apportioned, meaning

4     that you should only get a portion of that restitution amount.

5          Do you understand that?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  Okay.  Now, as far as the sentence that

8     you're going to plead guilty to, this Count 1, at the time of

9     sentencing, the government intends to move to dismiss the

10    remaining counts against you in the fourth superseding

11    indictment and also move to get rid of the forfeiture

12    allegation.

13         Is that your understanding?

14         THE DEFENDANT:  Yes, your Honor.

15         THE COURT:  Okay.  They get rid of all of the other

16    superseding indictments also.

17         All right.  Let's talk about your trial rights because

18    that's the most important thing that you need to understand

19    today as far as your trial rights that you would be waiving.

20         You do have a right to have a trial by a jury of your

21    peers.  You have a right to be represented at trial by an

22    attorney.  And you have a right to have a speedy trial.  And if

23    you wanted to do so, we could set that trial.  In fact, we have

24    a trial date coming up that we could set a trial for you if you

25    wanted.

1      Now, today, if we were to begin a trial, the way that

2  it would work is that I would call in random individuals to sit

3  as prospective jurors on your case, and I would ask those

4  jurors whether they could be fair and impartial.  That's what I

5  would want to know, and I would ask them different questions to

6  find that out.

7      If their answers to my questions showed that they

8  could not be fair or they could not be impartial, then I would

9  strike them for cause.  Also during this process, both your

10 attorney and the prosecuting attorney would have what we call

11 peremptory challenges.  Those are a handful of strikes that

12 they can use strategically to strike prospective jurors, and

13 they can do that so long as they don't do so in a

14 discriminatory way.  So only after we all agreed on the 12

15 individuals who would sit as the jury on your case would I

16 swear them in, I would tell them that you're innocent until

17 proven guilty, and that it remains the government's burden to

18 prove you guilty beyond a reasonable doubt.

19     So the government would start its case-in-chief, and

20 they would call witnesses and they would put on evidence in

21 order to meet that burden.  And during this process,

22 Mr. Whitney could cross-examine those witnesses because you

23 have a constitutional right to confront the accusers against

24 you.  Also he might challenge the evidence by using the Federal

25 Rules of Evidence.  He might say, for example, something is not

1   relevant or that something is overly prejudicial, and I would

2   make those evidentiary calls using the Federal Rules of

3   Evidence.

4          Now, once the government completed its case-in-chief,

5   I would turn to you and I would say, "Do you want to put on a

6   case?"  And, of course, you wouldn't have to because the

7   government would still have the burden to prove you guilty

8   beyond a reasonable doubt, so you could do nothing if you

9   wanted to.  However, if you wanted to put on a case, you could.

10  You could call witnesses.  You could testify.  You could bring

11  in evidence.  And if Mr. Whitney needed help getting that

12  evidence or those people here into the courtroom, I would issue

13  trial subpoenas to help him get those people and that evidence

14  here to court.

15         Also if you chose in this process not to testify, I

16  would tell the jury that they could make no inference of guilt

17  based upon you not testifying because you also have an absolute

18  right not to incriminate yourself.

19         Now, only after the entire trial process was completed

20  and the jury went into the jury room and deliberated and

21  reached the conclusion that you're guilty of Count 1 of the

22  fourth superseding indictment would I enter a judgment of

23  guilt.  But today if you plead to this plea agreement, you're

24  waiving all of those trial rights.

25         Do you understand that?

1      THE DEFENDANT:  Yes, your Honor.  Yes, your Honor.

2      THE COURT:  Okay.  Now, as far as the appellate rights

3  are concerned, you're waiving all appellate issues that might

4  have been available if you had exercised your right to trial,

5  and also acknowledging that you have the right to appeal your

6  conviction.  If the government makes that motion for downward

7  departure pursuant to 5K1.1, then you're also waiving your

8  right to appeal your conviction and any pretrial rulings by the

9  Court and any part of the sentence, and that even includes the

10  order of restitution, and that's because of the concessions

11  that the government would make in that 5K1 departure.

12      Do you understand that?

13      THE DEFENDANT:  Yes, your Honor.

14      THE COURT:  Now, if the government makes the motion

15  for downward departure, you're also waiving your right to

16  challenge your conviction and sentence in any future, what we

17  call collateral attack or future challenge.  That's a motion

18  that we call a habeas petition, maybe you've heard the term, or

19  one pursuant to Title 28, United States Code, 2255.  Now, that

20  waiver doesn't apply to a claim of involuntariness or

21  ineffective assistance of counsel.  And it also won't prohibit

22  you from seeking a reduction of your sentence if there's a

23  change in the law that is directly applicable to you and it has

24  been made retroactive by Congress or the Supreme Court or the

25  Sentencing Commission.

1          Is that your understanding?

2          THE DEFENDANT:  Yes, your Honor.

3          THE COURT:  Okay.  Now, this is a public document.  It

4     will be filed in the public record.

5          Do you understand that?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  Is anyone forcing you today to do this,

8     Ms. Corvite?

9          THE DEFENDANT:  No, your Honor.

10          THE COURT:  Are you making this decision to plead

11     after talking with your attorney, judging all of the facts and

12     circumstances, and you reached this decision voluntarily?

13          THE DEFENDANT:  Yes, your Honor.

14          THE COURT:  Okay.  I'm going to turn then to

15     Mr. Netols and have him tell me the evidence that he believes

16     will show that you're guilty beyond a reasonable doubt.

17          MR. NETOLS:  Yes, your Honor.

18          If this case were to proceed to trial, the

19     government's evidence would be in the form of the records of

20     Washington Federal, including the (indecipherable) records and

21     in particular also the email records of Washington Federal, the

22     testimony of the other employees of Washington Federal

23     (indecipherable) and the admissions of Ms. Corvite.

24          What the evidence would show is that she became

25     employed by the bank in approximately 2003.  And by 2011, she

1    was the Chief Financial Officer who was responsible for

2    maintaining the bank's ledger and for any financial reports

3    including the --

4         THE COURT:  Hold on, Mr. Netols.  I think Gayle had

5    some trouble just then.

6         COURT REPORTER:  You're breaking up just a little bit,

7    Mr. Netols.

8         The last thing I heard was:  "She was the Chief

9    Financial Officer who was responsible for maintaining the

10   bank's ledger and for any financial reports, including the."

11        MR. NETOLS:  I'm going to go closer.  Is it better if

12   I'm closer?  Because before I think it was problematic.  Is it

13   better now?

14        THE COURT:  Yes.

15        MR. NETOLS:  Okay.  All right.  She was responsible

16   for preparing these financial reports, including call reports

17   and reports -- information to auditors and consultants and

18   regulators.

19        And our evidence would show that Ms. Corvite was

20   actually -- she was trained by John Gembara.  Her primary

21   experience was based on Mr. Gembara's instruction.

22        We would also show, based on the records of the

23   Federal -- Federal Deposit Insurance Corporation that the FDIC

24   had insured Washington Federal at least as far back as 1989,

25   and that had basically oversight, in addition to providing the

insurance, there was some oversight, and the FDIC relied on
things, including the call reports, to assess the bank's
performance.

We'd also prove that in approximately 2011, Washington
Federal was being supervised by The Office of the Comptroller
of the Currency.  And that was in the form of basically
examinations in which the OCC would rely on and review
documents, including the call reports, trial loan balances,
which are supposed to disclose the actual condition of the
bank, including delinquencies, and complying with lending
limitations and the actual loan histories, and that the OCC
would also look at the documents generated by third parties,
including consultants.

The evidence would show that by about 2011 through
when the bank closed, Ms. Corvite was involved in a conspiracy
to essentially embezzle money from the bank and then conceal
those embezzlements with false documentations.

Her role was primarily just falsifying documents and
records that would conceal that money was being embezzled from
the bank.

And to be clear, Ms. Corvite didn't receive any of the
money that was embezzled from the bank.  Her only compensation
was her salary.

Essentially, what the evidence would show -- and,
again, through her admissions and the testimony of others -- is

1    that over a long period of time, Ms. Corvite was basically

2    being instructed by Mr. Gembara to falsify records, and that,

3    while initially the changes could have been interpreted as

4    basically corrections of records, it became clear over the time

5    because the corrections were always consistent with the written

6    records of the bank and always to the benefit of the bank that

7    Mr. Gembara was instructing her to falsify records.

8              In particular, the evidence would show, with respect

9    to the records that were being provided by consultants, that

10   one of the consultants, Consultant A, would need -- would be

11   reviewing records showing the maturity dates of loans, and

12   because, of course, what the evidence would show is that these

13   loans were essentially not really loans, they were

14   documentations to basically conceal embezzlements.  These loans

15   were never maturing.  And so the maturing dates would always

16   have to be altered to conceal the embezzlements, in particular

17   the embezzlements to Mr. Kowalski.  And that with respect to

18   one of the overt acts that's charged, we would prove that on

19   May 30, 2013, defendant sent consultant an email that falsely

20   represented the maturity dates of a number of loans related to

21   Robert Kowalski.

22             The evidence would also show that there was -- the

23   defendant was involved in providing false information to the

24   FDIC, and that would be in the part of call reports.  And,

25   again, the evidence would show, based on defendant's admissions

and the testimony of other -- of the cooperating employees in this case, that Mr. Gembara would instruct the defendant to falsify the call reports. And these call reports were falsified in a way to conceal the level of delinquencies to make it appear that, to the extent that loans were delinquent, there was only a couple hundred thousand dollars of delinquent loans, and they were all in the 30- to 90-day range. In reality, the records show that there were many loans that were more than 90 days delinquent, and particularly there were millions of loans -- millions of dollars in loans that were more than 90 days delinquent.

Finally, the evidence would show that defendant was involved in providing false information to the OCC, and that was in the form of falsifying a trial balance. And in particular, along with Ms. Mandujano, Ms. Iriondo, and Ms. Torres, she was involved in the creation of false trial loan balances. In particular, the final loan balance that was the trial loan balance that was provided to the OCC in October of 2017, and that those -- that trial loan balance was falsified to basically remove loans that would have more documents -- embezzlement that was being booked by his loans that would reveal the criminal activity at the bank, and that was in particular to change and revise certain loans, change records which would conceal the identities of borrowers, loan balances, payment histories, making it appear that loans were

1    being paid, and in particular omitted documentation relating to

2    purported loans associated with Robert Kowalski,

3    Mr. Kasprowicz, Mr. Krejza, Mr. Matczuk, and others.

4           Finally, our evidence would show that in

5    December 2017, the bank failed, and that there was

6    approximately $66 million in non-performing loans.

7           And in addition to examination of the bank's assets,

8    that the loan -- there was also liability, and there were at

9    least ten account holders, primary CD holders, who had deposits

10   at Washington Federal and suffered losses that were not -- over

11   the insurance limit at the FDIC.

12          THE COURT:  Okay.  Ms. -- is that it, Mr. Netols?

13          MR. NETOLS:  It is, your Honor, yes.

14          THE COURT:  Okay.  Ms. Corvite, did you hear

15   everything that Mr. Netols just said?

16          THE DEFENDANT:  Yes, your Honor.

17          THE COURT:  Okay.  Anything that he said that you

18   disagree with?

19          THE DEFENDANT:  No, your Honor.

20          THE COURT:  Okay.  Then how do you plead to Count 1 of

21   the fourth superseding indictment?

22          THE DEFENDANT:  Guilty, your Honor.

23          THE COURT:  All right.  I'll accept your plea of

24   guilty.  I will hold off on starting the probation officer's

25   report since you have agreed to postpone your sentencing until

1   after the co-defendants.  And it's going to be a little while
2   before they are going to be sentenced, so I'll hold off on
3   that.
4           One last thing that I wanted to go over with you.
5   We're here today by WebEx.  We're doing all of this by
6   computer.  That's because we still have this pandemic occurring
7   and people still getting sick, and we're trying hard to prevent
8   everyone from getting sick.
9           Have you agreed today to do this change of plea by
10  video?
11          THE DEFENDANT:  Yes, your Honor.
12          THE COURT:  Okay.  And did you talk with your attorney
13  about that before you agreed?
14          THE DEFENDANT:  Yes, your Honor.
15          THE COURT:  Okay.  All right then.  We will not give
16  you a sentencing date.  What I'll do, I think, is just --
17  Mr. Netols will keep me apprised of when to bring you back in.
18  In the meantime, whatever conditions of pretrial release that
19  you're on will be the same conditions until we see each other
20  again.  Okay?
21          THE DEFENDANT:  Yes, your Honor, okay.
22          THE COURT:  Okay.  Stay well.
23          THE DEFENDANT:  Thank you.
24          THE COURT:  Anything else, Mr. Whitney, that I can
25  help you with?

1          MR. WHITNEY:  No, your Honor.  Thank you.

2          THE COURT:  Mr. Netols?

3          MR. NETOLS:  No, your Honor.

4          THE COURT:  Okay, everyone, have a good day.

5          MR. WHITNEY:  You, too.

6          THE DEFENDANT:  Thank you.  You, too.

7          THE CLERK:  Court is in recess until 11:30.  You can

8      please log off.

9          (Proceedings concluded at 10:12 a.m.)

10                    C E R T I F I C A T E

11         I certify that the foregoing is a correct transcript, to

12     the extent possible, of the record of proceedings in the

13     above-entitled matter, given the limitations of conducting

14     proceedings via videoconference.

15

16
       _/s/ GAYLE A. McGUIGAN_____          _March 14, 2023_
17     Gayle A. McGuigan, CSR, RMR, CRR                    Date
       Official Court Reporter
18

19

20

21

22

23

24

25